The next argument is in Appeal 1231, Wesleyan Company v. Department of the Army. May I please the court? Good morning. Please proceed. Good morning. Richard Morehouse for the appellant, Wesleyan Company. Your honors, this is the second time we are before this court. We're quite aware of this. Yes, sir. What we've come down to essentially is a case where this court remanded to the board, we believe the board made material errors of law and mixed questions of law. In fact, in deciding the case on the merits. As the court may recall, when we were here... I didn't see any arguable legal error. Well, what's the legal error? The legal error we assert is that they failed to promptly apply the preponderance of the evidence standard. I don't know what that means. That sounds like a factual matter. That sounds like it has to do with weighing evidence, not selecting, for example, the correct legal rule. That would be a legal error if some tribunal selected the wrong standard to apply. Your honor is correct. The board's decision does not say we are applying a clear and convincing standard to this case. They clearly say they are applying a preponderance of the evidence standard, but we believe in the application they look for additional evidence that was not required under the preponderance of the evidence standard. I don't understand what you're saying. How do you infer that they faulted you because although you established a preponderance, you didn't establish a higher level of proof such as clear and convincing? Where do you get that? I think we get it from the point that, as one of the major points I would like to make this morning, is that the board itself adduced testimony that they failed to consider or ignored in their decision. I don't understand what you mean by that either. Look, I'm trying to help you. If you can show a legal error, there's no deference on a legal error issue, and so you have an easier time winning. Correspondingly, if the alleged errors are factual, there's a very high level of deference that we're actually required. We have no choice to afford. So if there is a legal error that's reviewable without deference, it's very important to get that clearly in focus. So that's why I'm asking you how you infer that they applied an incorrect standard such as clear and convincing evidence. Because I believe it's implicit from the fact of the evidence they considered and did not consider. It's not a direct argument. What do you mean considered and not considered? We have legion case law saying that a tribunal is presumed to have considered all of the evidence and all of the testimony and all of the documents put before it, and they don't have to regurgitate it in their opinion. So are you saying they didn't mention it, so therefore I conclude they didn't even weigh it? They didn't even consider it? They didn't even look at it? Is that what you're saying? Yes, I think it's a rebuttable presumption that the board considered all of the evidence. And the point that we were trying to highlight is the board itself involved itself directly in colloquy with witnesses. They asked particular questions. They asked questions on cross-examination before I was able to ask the same questions I intended on cross-examination. But the record is absolutely silent as to that testimony that was adduced. What's the breach of contract here and what's the evidence of it? The evidence of breach of contract ultimately devolves to the point that you have a patent by Camelback that has the same material features as the Wesleyan concept of the fist flex. You also have a patent by your client, right? That is correct, from 1985. Using those features. Not all. Not all. One of the key features, as our patent attorney testified, was that the Camelback has a shutoff valve. The Wesleyan prototype that was delivered to the Army, even as the board found tagged, had a shutoff valve. And what's the breach again? We believe that this is certainly a circumstantial case. We are not going to disagree with that. But the breach is that either intentionally or negligently the Army disclosed our proprietary concept and the ultimate beneficiary of that was Camelback. And what's the evidence of the disclosure? The evidence of the disclosure are features in the- What I was reading is your client walked in and saw our product opened up and there was a tag. That was part of it. That's right. That's right. The board allowed- And the board evaluated all this and said that it didn't amount to a breach. No, they didn't evaluate that particular evidence. That was one of the points. You mean they didn't comment on it? Correct. They did not comment on the decision and we're saying that, yes, we completely understand the presumption. But when you have so much evidence that was adduced by the board and they do not refer to it, even as a footnote, even the government says, well, the board assessed the credibility of the witnesses. There's no statement in the decision that the board assessed the credibility of the witnesses. The judge allowed in, to his credit, he allowed in the testimony from Mr. Schneider, Wesleyan's president, that he had been told by Mr. Miller of Mine Safety Appliances who had met with Mr. Snow at Natick Labs, the original project manager, the Army intends to, quote unquote, knock off the Wesleyan prototype. Which Schneider then, in a series of questions asked by the judge, said, I believe that means improper reverse engineering in violation of the proprietary legend that was on the tax. But is it generally agreed that the final product, the Camelback product, but for the shutoff valve, if the patents, if the Wesleyan patents had not expired, still would not infringe those patents? That is, that they are sufficiently different from various features and that the concern is that the shutoff valve, because of the Battelle report or the disassembly or whatever other reason, necessarily got into the loop because of improper communication, rather than any public records such as reading the Wesleyan patent. The second Camelback patent, in fact, cites the Wesleyan patent as prior art. This is the 2006 Camelback patent at JA 1051. But the point I was making, Your Honor, is the Wesleyan patent does not have the shutoff valve. Now, to answer you, and I apologize if I'm being oblique, but I'm trying to get the board's point that they try to raise on this. They try to make the argument that the shutoff valve was intuitive. Anyone would have put a shutoff valve onto one of these devices. In fact, the testimony from Mr. Schneider was, I never had a shutoff valve in my original concept. In fact, when it was tested by the soldiers in the field, the Army recommended back to me that I put a shutoff valve because if the soldier was lying down wearing a gas mask, the water would continue to come out and continue to dribble. So as Mr. Erickson, the patent attorney for Wesleyan, testified, and as the board said itself, there was no patent expertise before, but there was. Mr. Erickson, he testified that the shutoff valve in and of itself was not necessarily intuitive. Just to try and understand what really happened, because it's not been our experience that, despite the testimony about knocking it off, that this is a pattern of behavior. It seems, and I think it's not really disputed, that despite the inconsistent testimony as to the disassembly, that disassembly to see how something worked would not necessarily have been prohibited. It wasn't expressly prohibited. The Wesleyan reservation of proprietary rights, let us assume, was a valid reservation that by accepting the samples, that that adhered to that reservation. Here, after the passage of some 20 years, the expiration of patents, which would not have been infringed, even if they hadn't expired, trying to figure out whether there was either inadvertent or deliberate wrongdoing, is difficult, and particularly because the details of the Wesleyan device were published in the Wesleyan patent. And so they were public knowledge. I think that the law is that if you learn something through it in a prohibited manner, that the fact that you could also have gleaned it from the public record doesn't save you. But is that all that Wesleyan can really rely on? No, there is more, Your Honor. There are two other points. First of all, Mr. Snow's successor, Mr. Daviau, he testified that the Army had a robust receipt and tracking system for all the prototypes. And as I alluded to a little bit earlier, Judge Freeman beat me to the punch and asked him questions about that particular process. Is it somehow reversible error that Judge Freeman asked questions or anticipated things you were going to say? No, no. You said something earlier that I couldn't understand what your point was, that somehow the proceedings are reversible because the judge was very active in eliciting evidence? No, that wasn't my point. My point was where you have a series of involvement by the board or the judge in the testimony, in gathering the evidence, and none of that appears in the decision. I think you rebut the presumption that the judge considered all the evidence before him, especially where he had directly adduced that testimony. And in response to Your Honor- If we follow the logic of what you're saying, then if there's a trial where there are 600 bits of evidence and 10 of them are left out, it's reversible. It depends on how material that bit of evidence is, yes. I don't know of any case law support for such a rule. I don't believe the case law, with all due respect, would allow a series of material facts not to be considered in a decision. I understand the presumption, and I agree with the presumption. All I'm saying is I believe it is rebuttable, and on these facts it is certainly rebuttable. It's rebutted because things that the trial- I shouldn't say trial judge, the board member elicited he then didn't comment on in his opinion. Yes, sir. That proves that he didn't consider material evidence. Yes, sir. If I could just finish in response to Judge Newman's point, I realize I am in my bottle time. We'll restore rebuttal time. You don't need to worry about that. You certainly better respond to the question. Thank you. I would have assumed that the Army in its post-hearing briefs would have come back with some evidence, some evidence, a piece of paper, a slip, a tag, a receipt saying, here's the evidence that supports our robust record-keeping system. There is nothing in the record that supports that. There is nothing in the record that supports that. The second point I have, Your Honor, on the Camelback patent. The Army early on in this litigation decided to, I'll use the term, ally itself with Camelback. They certainly communicated with Camelback. They went through three Rule 30B-6 Camelback witnesses. There was no clear and convincing testimony from Camelback how they originated those patents. The patents I'm talking about are the 2005 and 2006 patents, which had the NBC compliant tube. That's the tube that runs from the water reservoir to the gas mask. That was the original Wesleyan concept. There is nothing in the record explaining from Camelback how that came to be. Why does Camelback have any burden in this case? Camelback does not have a burden in this case. We didn't introduce Camelback to this case. The Army did. One of our points is in response to the government's position. You seem to be saying evidence Camelback produced at the government's request was weak. How does that affect the reversibility of the board decision? The board decision basically, as I read it, is you were unable to prove elements of your case. Your theory was that the government illicitly gave your technology to Camelback. Then Camelback benefited from that. The board decision basically says, well, that's what you assumed happened, but you didn't prove that it happened. Therefore, you have to lose because the burden of proof is on you. I think you could read into that. I appreciate that. I think that what you read into that is the board was saying that a lot of the evidence in our case is circumstantial. I do not disagree it's circumstantial. When you have an Army witness testifying of almost 10 years of contacts between the Army and Camelback to develop a hydration system, at least the board should have considered whether that was material evidence and either handled it, accepted it, disregarded it, waited, did something with it. The Army people could have talked to Camelback every day, but that would prove that in any of those conversations, they provided secret information that they had under restrictions from your client. It doesn't directly prove it, as I said. It doesn't indirectly prove it either. I would respectfully disagree if the patent has all those similarities, if the patent is the same concept. A corporation like Camelback does not make decisions to enter a market or come up with a new product by itself. You have Schneider, who was a small inventor. You have Camelback, which became a fairly large company. There are corporate decisions made to go into this market. There is no evidence why Camelback went into the NBC compliant hydration system market. Why do we have to worry about that? Either you can prove that the Army leaked your secrets or you can't prove it. The tribunal said you didn't prove it. There's a lot of evidence in various directions to my initial reading. The fact finder said the evidence favorable to your theory fell far short of proving your theory. Therefore, you have to lose because you have the burden of proof. Now, when we look at that evidence, we can't reverse unless we conclude that the evidence supporting the board decision was less than substantial. It looked to me like there was evidence going in all kinds of different directions. The board could have come out with almost any conclusion and it probably wouldn't be reversible here because it would be supported by substantial evidence. But I would argue that there was more substantial evidence on our side. That's not the standard. If there's substantial evidence supporting your case and there's substantial evidence supporting the other side's case, but your evidence is stronger, you still lose. Because if the fact finder's decision is supported by substantial evidence, it's irreversible, even if your evidence was stronger. I would respectfully submit one of the things the court should consider is did the board have substantial evidence under that standard? That's all we can do. If they did not consider the points that I've articulated. I think we understand your case. Let's hear from the government. Thank you. Thank you, Mr. Harrington. Well, what was the missing proof? Excuse me, Your Honor? What was the missing proof? What were the pieces of evidence that they would have won if only they had produced that they didn't produce? Well, there was a lot of evidence that had to be produced that was not produced, Your Honor. If you go back to the court's decision in 2006, the court spelled out in some detail what had to be shown. What had to be shown was that there was... This is a case of a failure of proof. This is, therefore, a case where in order to win, the petitioner would have had to have produced some proof that they didn't. I'm just asking you to give me some examples, the strongest examples, of what it is that they needed to put on the evidentiary table in order to win that they didn't put on the table. Example one, Your Honor, is that there was no proof that there was an actual disclosure of some sort of proprietary information that the Army gleaned from Wesleyan to a third party. The fact that there was no disclosure is, first and foremost, the problem with the case. Well, I don't understand what you mean by that. That there would have to be direct testimony, that I, the witness, was there when the Natick lab guy told the Camelback guy, here's all the secret information. I mean, of course, that would be very dramatic evidence, but you can't be saying that that kind of evidence is required or the complaining party has to lose. Your Honor, we are not saying that the board could not look at circumstantial evidence to reach its conclusion. The board did look at circumstantial evidence to reach its conclusion. It analyzed the claim about the reports that were submitted, the letters from ILC Dover, the supposed disclosure to Camelback. It looked at all of the circumstantial evidence presented by Wesleyan and said, you didn't convince us from that evidence. We are not going to draw the inference from that evidence, based on what you gave us, that there was an improper disclosure. Okay, and that's why I'm asking you, well, what additional piece of evidence would have tilted the scales the other way? Well, it's obviously something like you said, Your Honor, if somebody had said... But what I'm asking you is what additional evidence would just barely tilt the scale the other way, not what's the slam dunk dream case that no lawyer ever actually sees. It's difficult to speculate, Your Honor, about evidence that wasn't in the record, that wasn't presented, and that there's no proof of what might or might not have tilted the scales in this particular case. Of course it's speculative. I'm asking you to speculate because you're a lawyer who studied the record in this case. Your Honor, I did not see anything in the record that came close to suggesting that there was some sort of disclosure of confidential information by the Army to Camelback, to the producer of the report that was cited, the Battelle report, to ILC Dover. The other aspect of what had to be proved that was not proved, Your Honor, and this goes right back to the decision of this court three years ago, the court said, first of all, even if the purchase orders contained a confidentiality provision, and that's an additional problem, but Wesleyan would have to prove that the Army obtained confidential information... You're throwing additional problems on the table here. I thought it was undisputed that the prototypes, 29 or some such number, had physical tags attached to them, I think by string, which tags contained reservation of rights, which were viewed by the board as sufficient reservations of rights. Therefore, if the Army had disclosed information from those prototypes to Camelback or others, it would have been a violation. No, Your Honor, that's not the case. What the board said, the board came in and it issued two decisions post remand. It said in the first decision that there was no incorporation by reference of the DFARS clause of confidentiality from the MOU, or from Army policy statements, into the purchase orders that are the contract that we're focusing on. It said there was no incorporation by reference. I'm not asking about tags. I'm not asking about incorporation in purchase orders. And it went on to talk about the tags, and it assumed, it did not find, it specifically did not find, that the language from those tags was somehow incorporated into the purchase orders. And, in fact, it would have been an error for the court to have found that, because the only representative of the government with the actual authority to change the terms of those purchase orders was the contracting officer. And the board found, as a factual matter, that the contracting officer was never aware of these tags. Wesleyan didn't notify the contracting officer that it was placing the tags on these products. So your position is no matter what the tags said, no matter how explicit or detailed or lengthy or what they said, it's irrelevant because it wasn't made part of the contract, the purchase order, by the contracting officer? Yes. Wesleyan cannot, by simply unilaterally placing tags on the products that they are shipping, change the terms of the purchase orders. Does your case depend on that position, that there was nothing binding the government? No, it does not, Your Honor. That is a threshold question that the board, frankly, skipped over. And it explicitly did that. It didn't do it inadvertently. It skipped over that because it said, we've heard testimony at a live hearing for several days. And it looked at that live testimony and said, even if we assume, for the sake of argument, and that's what they did, assume for the sake of argument, that this language in these tags somehow binds the Army. Well, we didn't get the evidence that we needed. We didn't get any evidence from Wesleyan that there was some sort of improper disclosure of confidential information. Additionally, the board said they were not presented proof that the confidential information and what that was isn't spelled out. But this court said before, whatever the confidential information that's disclosed has to be, quote, gleaned solely, unquote, from the 29 systems that were purchased under these four purchase orders. Well, that is not the universe of systems that the Army had, as the court knows from the record in the case before. It's probably inaccurate. What did the Army say they did when they kept requesting more samples from Wesleyan? They obviously were evaluating them. They evaluated them. Otherwise, they were just squandering their resources, right? No, they evaluated them at various tests, at various locations, I think at Fort Leonard Wood, in a- Fort Benning and elsewhere. That's correct. And they evaluated them just as they told Wesleyan they were going to evaluate them. They stopped doing these evaluations, I believe, in around 1990. Roughly, Your Honor. And then they continued on. They did not follow up. They did not decide to buy the Wesleyan system. Years later, the disclosure to Camelback, which was the only one that was really talked about at length, the alleged disclosure to Camelback, let me be perfectly clear, is something that supposedly happened, say, eight years or more in the future. And I'd like to talk about that theory that we heard a little bit. Essentially, I think what Wesleyan is saying is that in 1984, 1985, the Army supposedly reverse engineered the system. Well, there's no actual evidence that there was any reverse engineering going on. They say then in the late 1990s, nearly 15 years later, that some sort of confidential information, they don't specify what, was disclosed to Camelback. But in addition to the time interval, you've been stressing that it was X years later, it was eight years later, it was 15 years later, it was nine years later. What difference does it make what the delay was? If there were a disclosure of truly confidential information, the timing wouldn't seem to make any difference at all. I agree, Your Honor. The timing doesn't make any difference if there was, in fact, a disclosure. The timing does make a difference on the probability that a disclosure took place. Why on earth would information that was gained in 1983 be disclosed in 1998? You mean the improbability? Thank you, Your Honor. That's exactly what I meant. After 15 years, why would this information be disclosed, one, and the person who had the contacts with Camelback, John Kirk, had no involvement 15 years before in the analysis of Wesleyan's system. There was never any connection between Mr. Snow back in 1984, 85, made to Mr. Kirk, who was the one person at Natick Labs that had some contact with Camelback in the late 1990s. All these steps along the way. Are you implying that no one other than Mr. Snow, who worked at that lab, could possibly know anything about what Mr. Snow learned from the submissions made by Wesleyan? No, Your Honor. Was it possible that someone else knew? Mr. Snow was the person principally involved. Surely there were other people that were at least tangentially involved in the evaluation at that time. But there's no evidence that any of them—let me put it this way, Your Honor. The allegations that Wesleyan has made focus on Mr. Snow, and that's why I am focusing on Mr. Snow. But you say there was contact with Camelback by a different Natick Lab guy, different from Snow. That's correct. But you seem to be suggesting that since it wasn't Snow, that the gentleman who did talk to Camelback couldn't possibly have known of information that Snow gleaned. There is no evidence— Do I misunderstand you? There is no evidence in the record, Your Honor, suggesting that Mr. Kirk knew anything about what Mr. Snow did. Mr. Kirk was not involved in the initial evaluation. There's no evidence that Mr. Kirk ever spoke to Mr. Snow or anyone involved in the initial evaluation. Mr. Kirk was not involved in the same group that was doing the initial evaluation. He was working on a completely different system, not a nuclear, biological, and chemically resistant system, when he was working on it in the late 1990s. There's simply no connection. The record contains no connection whatsoever through which information might have flowed, much less establishing that there is not substantial evidence for what the Board found. Your Honor, because the Army's purchase orders contain no confidentiality clause, as I alluded to earlier, and because substantial evidence supports the Board's factual finding that the Army made no disclosure of confidential information, we respectfully request that this Court affirm the Board decision below. Did the Board find, as I think you just said, that no disclosure was made of secret information, or did the Board simply find that Wesleyan had failed to prove that a disclosure was made? The Board found that Wesleyan failed to meet its burden of proof to show some sort of disclosure that could then potentially be a breach of contract. It didn't find to the contrary. It just found a failure of proof by Wesleyan. It analyzed each of the potential claims that Wesleyan presented and found that it had not presented sufficient evidence for each of those claims, specifically that there was no disclosure and specifically that there was no tracing back to the 29 systems. Mr. Morehouse emphasized something about the tube. What's your response to that? He seemed to suggest that the tube that was part of the prototypes provided by Wesleyan was then copied by the Camelbak product. I think that you can look at the record and there's a picture of the Wesleyan product, at least. The way the Wesleyan product worked is it had a canteen on the side. It had a tube that came up to a hand pump and then a tube that came up to the protective mask. Well, that's not the way the Camelbak product worked. There was no pump for the Camelbak product. It was a different concept. It was a different design. I think the only thing I heard counsel say was that there was a shutoff valve involved with both products. As best I can tell, that is the only similarity that has been alleged between the Camelbak product and the Wesleyan product. Surely, the simple fact that both contained a shutoff valve, a different kind of shutoff valve, not even the same sort of design or valve, is not enough to conclude that the Board did not have substantial evidence for its conclusion. The Board, to the contrary, found that there was no disclosure and found that the similarities between Camelbak's product and Wesleyan's product did not allow one to infer some sort of improper disclosure. I guess you're implying that any version of such a drinking system would have to have a shutoff valve and therefore the fact that the Camelbak system and the Wesleyan system both have shutoff valves wouldn't prove that there was some bleeding over of secret Wesleyan information to Camelbak. Is that what you're saying? I would suggest that anyone who is designing a system, that Camelbak, in designing a system, could easily have looked at the system and said independently of any information that was gained, we're going to have a shutoff valve. It didn't need information from Wesleyan to conclude that it wanted a shutoff valve. And so that does not establish, does not even provide, it does not provide any evidence from which you can infer that there was some sort of improper disclosure. In other words, the answer is yes. It was a long, long way of saying yes, Your Honor, thank you. We therefore respectfully request that the court affirm the decision below. All right, thank you. Mr. Morehouse. Yes, thank you, Your Honor. Just a few follow-up points. In terms of the incorporation of the reservation of right on the tags to the purchase orders, I want to address the point that counsel made that the board found that there was no evidence that the contracting officer, singular, knew of tagged prototypes. The problem with that is, and I will refer the court to the joint appendix 1086 to 1089. They're talking, I believe, about different contracting officers. The purchase orders in question for the 29 prototypes, and there's no dispute that 29 prototypes are key to this case, were different contracting officers from Mr. Snow or whatever individual the board had in mind as the contracting officer. These contracting officers, Messrs. Stahl, Weick, and Jeffrey, were not called at any time by the Army to testify, nor were they ever called for deposition. So it is erroneous for the board to have concluded the contracting officer was unaware of tagged prototypes. That's what Snow said, but most of what Snow said was, I don't recall, I don't recall, I don't recall. My problem with your case is because certainly there's a concern when an individual or a small enterprise has a good idea and provides it to the government for evaluation, and then finds some time later that what looks like that idea is in some other product. But here there was a prototype provided, several were purchased, and let's accept that they were studied and disassembled, and that the tags weren't always attached, and that they were fully evaluated and understood. Maybe it is indeed significant that nothing happened for another eight years, and that the product which eventually was produced would not have infringed the patent. It had certainly some similarities, but many of the basic principles were already known for portable fluid supplies. And the idea of the valve, which was mentioned in the Battelle report, is perhaps a significant consideration, which initially was not in the prototype, but eventually was. But it's still a step to assume or presume, because a number of assumptions and presumptions would have to be made that there was either an innocent but certainly a wrongful appropriation of proprietary information, which by the time the final product was made by Camelback had lost its proprietary nature because it was published in the patent. So how do we get from here to there with the intent to secure and protect those who are willing to deal with the government and provide good ideas to them? I do have trouble making that step. I notice the magnitude of the damages you've requested as well, and still perhaps the passage of time certainly is significant in this case. Let me address that, Your Honor, and I appreciate it. I do want to make one point. In one of its earlier decisions, the board drew a distinction between post-patent disclosure, and Your Honor is absolutely correct, post-patent disclosure other than an infringement action is not actionable. But the board did hold, we can still look at the issue, whether there was post-patent misuse. And I will submit what happened in this case is that the concept of the on-the-move hydration system for a gas mask, first propounded by Wesleyan, became almost institutional knowledge within the Army. I'm trying to look for an explanation. It became institutional knowledge within the Army. And in fact, one of the Army witnesses, this is also not mentioned in the board's decision, testified that the Wesleyan system, notwithstanding the fact that almost at the time, more than almost 25 years had come and gone, the Wesleyan system as well as the Camelback system was still state of the art. So it wasn't something that had molded for years on the shelf. I think what happened is, and this is speculation, the Army adopted the concept as if it were its own. And this minimizes the passage of time. Because in response to counsel's question, Mr. Kirk was not involved, as he testified, in the Wesleyan. But he was involved in the MOLLE system. This is the backpack, this is the load carrying system for the soldier, beginning in 1997. And one of the key elements of that is a hydration system. And he had almost 10 years of contact, by his own testimony, with Camelback before the Camelback patents for the NBC-compatible system were issued. All right, we thank you both. Counsel will take the appeal under advice. Thank you, court.